IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RAY COX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 1:23-cv-57-ECM |
| | ) | [WO] |
| JASON SMOAK, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

On January 25, 2021, James Hinson ("Hinson") died while in custody at the Houston County Jail ("Jail"). Plaintiff Ray Cox ("Cox"), as the personal representative of Hinson's estate, alleges that Jail staff were deliberately indifferent to Hinson's serious medical condition, which ultimately resulted in his death. Specifically, Cox claims that Defendants Jason Smoak ("Smoak"), Catrina Burkhalter-Murry ("Burkhalter-Murry"), Mindy Van Ackern ("Van Ackern"), Evelyn McGhee ("McGhee"), Connie Hinson, Rhonda Rexroat, James Brazier ("Brazier"), and Kelita Moore (collectively, "Defendants"), deprived Hinson of his Fourteenth Amendment right to due process, pursuant to 42 U.S.C. § 1983, and negligently provided him medical care, in violation of Alabama state law. On July 12, 2023, the Court dismissed all claims pursuant to § 1983 and Alabama state law which occurred before January 23, 2021. (Doc. 39). On August 28, 2024, the Defendants filed a motion for summary judgment, which seeks judgment on

all remaining claims against all Defendants and is now before the Court.[1]  (Doc. 73).  The

motion is fully briefed and ripe for review.  Upon review of the briefing and record, for

the reasons that follow, the motion is due to be GRANTED.

## II.  JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the federal law claims in this

proceeding pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law

claims pursuant to § 1367.  Personal jurisdiction and venue are uncontested, and the

Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28

U.S.C. § 1391.

## III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

*Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV.

P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable

inferences in favor of the party opposing summary judgment.'"  *Fla. Int'l Univ. Bd. of

Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).

However, "conclusory allegations without specific supporting facts have no probative

value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation

omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for

the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-*

---

[1] In his response brief, Cox "agrees to the dismissal of all claims except for [his] deliberate indifference claims against" Burkhalter-Murry and Smoak. (Doc. 80 at 4).  Accordingly, the Court analyzes only Cox's deliberate indifference claims against these two Defendants.

*Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* at 1311. The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252. Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.* However, "mere conclusions and

unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV.  FACTUAL BACKGROUND

The facts, viewed in the light most favorable to the non-movant, are as follows:

On January 19, 2021,[2] Hinson was arrested and booked into the Jail. (Doc. 74-5 at 4).  The following morning, January 20, Smoak, a licensed physician assistant at the Jail, and Van Ackern, a licensed practical nurse ("LPN") at the Jail, conducted a medical intake examination of Hinson. (Doc. 74-1 at 6).[3]  During his intake examination, Hinson reported the following:  (1) he was prescribed blood pressure medication but did not know its name; (2) he had a history of addiction to pain pills; (3) he was opioid dependent; (4) he was concerned about withdrawal symptoms; and (5) he previously had thoughts of suicide or self-harm. (*Id.*).  Van Ackern also noted that Hinson had an amputated leg. (Doc. 74-3 at 5).  Except for his mildly elevated blood pressure, Hinson's vitals were stable. (*Id.* at 7).  Van Ackern obtained Suzanne Hinson's, Hinson's wife ("Wife"), phone number and attempted to contact her about Hinson's unknown blood pressure medication, but Van Ackern could not reach her. (*Id.* at 6).  Van Ackern also noted that Hinson "reported pain from an open wound on the stump[4] of his right leg which he said had been present for approximately four weeks." (Doc. 74-3 at 5).  Both

---

[2] Unless otherwise noted, all events discussed herein occurred in 2021.

[3] "A medical intake procedure is an initial examination of the inmate where a licensed medical professional addresses any medical needs or concerns that an inmate may have after being booked into the Jail." (Doc.74-1 at 3).

[4] The parties refer to the spot at which Hinson's leg was amputated as a "stump." For that reason, the Court refers to it as such as well.

Smoak and Van Ackern claim that Hinson did not exhibit, complain of, or report symptoms that suggested he was suffering from a condition requiring urgent medical attention during his intake examination. (Doc. 74-1 at 7; doc. 74-3 at 6).

Upon completing the intake examination, Smoak determined that Hinson was at risk of opioid withdrawal and high blood pressure. (Doc. 74-1 at 6–7).  In response, he developed a medical treatment plan. (*Id.* at 7).  Smoak prescribed Hinson 0.10 mg of Clonidine to reduce his elevated blood pressure and alleviate potential opioid withdrawal symptoms. (*Id.*).  Additionally, Smoak ordered a daily assessment of Hinson's vitals for the following ten days. (*Id.*).  Finally, Van Ackern cleaned Hinson's "leg wound, noting the presence of a reddish-orange color, thick and sticky in consistency." (Doc. 74-3 at 6).

On January 21 and 22, in accordance with Smoak's medical plan, Burkhalter-Murry, an LPN at the Jail, assessed Hinson's vitals and administered his prescribed medication. (Doc. 79-2 at 2).  She reported that "Hinson did not present with any symptoms or complaints that caused [her] to believe that he was experiencing a serious medical event that required emergency medical treatment" and that "[a]t no time did Hinson request emergency or additional medical treatment." (Doc. 74-2 at 5).  Wife also spoke with Hinson in the morning on January 22.  About their phone call, she said:

> [Hinson] said he was worse.  He told me that he was doubled over in pain, that his stomach was on fire, that he was throwing up.  He said he could not even keep water down. He said that he was weak and sick.  He said he was afraid he was not going to make it.  He said he could not get anyone to help him.  He told me he was begging for help.

(Doc. 79-4 at 2).

At some point on January 22, "[m]edical staff was notified by the floor deputy . . . that Hinson had busted the blister on his stump causing it to bleed, and then stated the bone was coming through and he needed to go to the hospital." (*Id.*). McGhee, an LPN at the Jail, responded to this incident, and noted that Hinson "asked to shower at that time."[5] (*Id.*). McGhee says that "[a]t no time during [her] interaction with Hinson on January 22 did Hinson complain of any pain or appear to be experiencing any discomfort." (*Id.* at 5). "His primary grievance," according to McGhee, "was that he could not shower as he was told the pod was on lockdown due to COVID and he had failed to shower at the allotted time." (*Id.*). Later that day at approximately 6:55 p.m., McGhee was notified that Hinson cut his wrist. (Doc. 74-4 at 4). She "entered the pod where Hinson was being housed and found him standing in the window at this door. When [she] reached the door, he held up his left inner wrist and stated that he needed to take a shower." (*Id.*). She examined a superficial laceration with no active bleeding on his wrist, and an open wound on the stump of his amputated leg. (*Id.*). McGhee claims that "[n]o treatment was required at that time as Hinson had self-harmed himself on two occasions to manipulate staff into allowing him to shower[,] which led to him being placed on suicide watch."[6] (*Id.*). While Hinson was on suicide watch, members of Jail staff conducted regular wellness checks on him throughout the day and night. (Doc. 74-5 at 4).

---

[5] Inmates had limited shower access at the time due to COVID restrictions. (Doc. 74-4 at 5).

[6] "Suicide watch entailed the removal of all property [from Hinson's cell], including the mattress cover and mat." (Doc. 74-4 at 5). Hinson "was placed in specialized coveralls that [do] not tear easily and contain a Velcro closure mechanism." (*Id.*). Inmates refer to these coveralls as a "turtle suit." (Doc. 74-5).

On January 23, Burkhalter-Murry once again assessed Hinson's vitals and administered his medication. Like the days prior, Burkhalter-Murry claims that "Hinson did not present with any symptoms or complaints that caused [her] to believe that he was experiencing a serious medical event that required emergency medical treatment" and that "[a]t no time did Hinson request emergency or additional medical treatment." (Doc. 74-2 at 5). Wife, once again, tells a different story about Hinson that day:

> I could tell from how [Hinson] spoke that he was terribly sick, much worse than Friday. He sounded weak and sick. He told me that he could not even stand up to talk to me on the phone. He had to sit on the floor. [Hinson] said he felt like someone was sticking a knife in his stomach. He said his stomach was on fire. [Hinson] was crying. He told me we would not see him again. We talked about what I would need to do if he died, about his funeral. He repeatedly said he was not going to make it.

(Doc. 79-4 at 2).

At 1:00 a.m. on January 24, Hinson complained of chest pains to a corrections officer. (Doc. 74-1 at 7). Hinson's "vitals were taken immediately after reporting to the officer[,] and [they] were deemed stable and not at a level that would dictate the need for any emergency medical protocol." (*Id.*). "He was advised to rest and request a medical check." (*Id.*). Hinson did not report abdominal pain at this time. (*Id.*).

Later that morning at 8:10 a.m., Burkhalter-Murry examined Hinson at a sick call.[7] (*Id.* at 8). Hinson complained that—for five consecutive days—he suffered from stomachaches, headaches, and constipation. (*Id.*). Burkhalter-Murry noted that Hinson's

---

[7] The Court understands a "sick call" to be a medical visit where the provider performs an examination beyond a basic vital sign check. (Doc. 74-2 at 4).

abdomen was tender to the touch, but not abnormally sensitive. (*Id.*).  Additionally, she detected bowel sounds in all four stomach quadrants and found that his blood pressure had improved from its elevated level in the days prior. (Doc. 74-2 at 5).  However, Hinson's heart rate increased to 121, and Burkhalter-Murry noted that his breathing was rapid and shallow. (Doc. 79-2 at 3).  She reviewed his medical records, found that his "vital signs were stable and consistent," and developed a course of treatment. (Doc. 74-2 at 5).  Burkhalter-Murry prescribed Miralax for constipation and Tylenol for headaches, and she recommended that Hinson continue receiving daily vital checks. (*Id.*).  She also requested that Hinson attend a follow-up visit in the medical clinic five days later. (*Id.*). Burkhalter-Murry claims that at no time during this sick call did Hinson exhibit, present, complain of, or report any symptoms or complaints indicating he was experiencing a serious medical event that required emergency medical treatment. (*Id.*).  And in Smoak's opinion, "Burkhalter-Murry provided the appropriate treatment consist[ent] with the symptoms reported by Hinson." (Doc. 74-1 at 8).

Hinson had no further contact with medical personnel.  He was found dead in his cell early in the morning of January 25.[8]  In the twenty-four hours preceding Hinson's death, Jail staff checked on him approximately fifteen times. (Doc. 74-5 at 5).  None reported that he appeared to be suffering from a medical emergency.  Brazier, who was Jail Commander at the time, "reviewed Hinson's jail file and learned that staff complied with all policies in their interactions with Hinson. . . . All complaints, requests for

---

[8] Cox asserts in his complaint and briefing that Hinson died from a perforated ulcer.  However, Cox cites to no record evidence in support of this assertion, and the Court did not find any.

treatment, treatment, medical orders, [and] staff compliance with those orders, was documented and fulfilled." (*Id.* at 4).

On April 5, investigators interviewed other inmates in Hinson's housing pod about his demeanor in the days preceding his death. (Doc. 74-5). David Kirkland ("Kirkland") described Hinson as "always asking for medical" by yelling, "can you let them [Jail staff] know I need to talk to them." (*Id.* at 1). Kirkland said that Jail staff would check on Hinson and that no one mistreated him. (*Id.*). He remarked that Hinson prevented him and other inmates from sleeping by constantly yelling and banging his prosthetic leg on items in his cell. (*Id.*). Jonas Smith ("Smith") also recalled Hinson banging his prosthetic leg, and described him as "paranoid, but normal one minute and on suicide watch the next, wearing a turtle suit." (*Id.* at 2). He says Hinson did not seem depressed and that "his mood was up, with eyes wide open while he talked on the telephone." (*Id.*). Smith heard Hinson complain about being unable to shower, and claims that Hinson "picked at his scab until it bled, seeking medical attention in an attempt to get released from jail." (*Id.*). Smith, like Kirkland, does not believe anyone mistreated or ignored Hinson. (*Id.*).

Chester Lewis ("Lewis")[9] spoke with Hinson through their cell doors. (*Id.*). He claims that Hinson did not eat his food, and that he would "bang on the door from midnight until 3:00 a.m. yelling 'help' to make the guards come in and check on him." (*Id.*). According to Lewis, Staff would come check on Hinson, and he received a visit from a nurse and his medication daily. (*Id.*). Lewis also recalled that Hinson "had some

---

[9] The Court refers to Kirkland, Smith, and Lewis, collectively, as "Inmates."

type of blade or something in his prosthetic leg and threatened suicide to manipulate the jail staff." (*Id.*).

On January 23, 2023, just under two years from the date of Hinson's death, Cox filed his complaint in this matter. (Doc. 1).  On February 21, 2023, the Defendants filed a partial motion to dismiss all claims pursuant to § 1983 and Alabama state law which occurred before January 23, 2021, because they were barred by the applicable statute of limitations. (Doc. 17).  The Plaintiff did not oppose this motion (doc. 31), and on July 12, 2023, the Court granted the motion and dismissed the aforementioned claims with prejudice (doc. 39).  On August 28, 2024, the Defendants filed the motion for summary judgment that is now before the Court (doc. 73), seeking judgment on all remaining claims against all Defendants.  On September 26, 2024, the Plaintiff responded that he "agree[d] to the dismissal of all claims except for [P]laintiff's deliberate indifference claims" against Smoak and Burkhalter-Murry. (Doc. 80).  Because the Plaintiff has agreed to the dismissal of all claims except for deliberate indifference against Smoak and Burkhalter-Murry, the Court addresses only those two claims in this Opinion.

## V.  DISCUSSION

The Defendants[10] move for summary judgment on Cox's § 1983 claims on the grounds of qualified immunity.  Qualified immunity protects government officials from suit when they are "performing discretionary functions" and "their conduct does not violate clearly established constitutional rights of which a reasonable person would have

---

[10] For the remainder of the Opinion, the Court refers to Burkhalter-Murry and Smoak, collectively, as "Defendants."

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   To determine whether qualified immunity is appropriate, the Court first must determine whether the Defendants were acting within the scope of their discretionary authority. *See Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022).  The parties do not dispute that providing medical care to inmates was within the scope of the Defendants' discretionary authority. (Doc. 75 at 10–11).  Because the Defendants performed discretionary functions, Cox must next point to sufficient record evidence that the Defendants (1) "violated [Hinson's] constitutional right[s]," and that (2) Hinson's constitutional rights "w[ere] clearly established at the time of the alleged violation." *See Ingram*, 30 F.4th at 1250.

The Defendants claim that they are entitled to qualified immunity because they did not violate Hinson's Fourteenth Amendment rights and that, even if they did, "neither the law nor the circumstances presented gave Defendants fair warning that their actions or inactions violated Hinson's constitutional rights." (Doc. 81 at 13).  Cox contends that a reasonable jury "can conclude that both [Smoak] and Burkhalter-Murry knew that Hinson was in serious medical distress" and that "[t]he law is clearly established that an official cannot ignore a life-threatening medical condition or fail to address the condition." (Doc. 80 at 6–8).  Here, the Plaintiff alleges that the Defendants violated Hinson's Fourteenth Amendment rights.   Accordingly, the Court defines the Fourteenth Amendment's deliberate indifference standard before applying it to the record evidence to determine whether Burkhalter-Murry or Smoak committed a constitutional violation.

**A.      Constitutional Violation:  The Fourteenth Amendment**

The Fourteenth Amendment protects against, in relevant part, the state deprivation of one's life, liberty, or property without due process of law. U.S. Const. amend XIV. When jail staff is deliberately indifferent to a pretrial detainee's serious medical needs, jail staff deprives the detainee of his life or liberty without due process of law, thereby violating the Fourteenth Amendment. *See Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). The Eighth Amendment, which prohibits the infliction of cruel and unusual punishment, sets the standard which governs deliberate indifference claims by prisoners. *Id.*  "Technically, the Fourteenth Amendment['s] [d]ue [p]rocess [c]lause, not the Eighth Amendment's prohibition on cruel and unusual punishment, governs pretrial detainees" like Hinson. *Id.*  "However, the standards under the Fourteenth Amendment are identical to those under the Eighth," and, accordingly, cases dealing with the Eighth Amendment are informative of whether the Defendants violated Hinson's Fourteenth Amendment rights in this case. *Id.*

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  To satisfy the first, objective inquiry, a plaintiff must demonstrate an "objectively serious medical need," i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and, in either instance, "one that, if left unattended, poses a substantial risk of serious harm." *Id.* "A serious medical need can also be determined by 'whether a delay in treatment

12

exacerbated the medical need or caused additional complications.'" *King v. Lawson*, 2024 WL 3355179 at *3 (11th Cir. July 10, 2024)[11] (citing *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019)).

To satisfy the second, subjective inquiry, a "deliberate-indifference plaintiff must prove that the defendant acted with 'subjective recklessness as used in the criminal law,' and . . . in order to do so, the plaintiff must show that the defendant was subjectively aware that his own conduct put the plaintiff at a substantial risk of serious harm." *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. July 10, 2024) (en banc) (citing *Farmer v. Brennan*, 511 U.S. 825, 837–844 (1994) (discussing the Eighth Amendment's deliberate indifference standard)).[12]  But, "in any event, a defendant who 'responds reasonably' to a risk, even a known risk, 'cannot be found liable'" under the Fourteenth Amendment. *Id.* It is not enough to show that the defendant "*should have known*" of a substantial risk of serious harm; instead, the defendant must "*actually* [*know*] of a substantial risk of serious harm." *Id.* at 1257 (emphases in original).   Further, a plaintiff must show that the defendant official was "subjectively aware that *his own conduct*—again, *his own actions or inactions*—put the plaintiff at substantial risk of serious harm." *Id.* at 1258 (emphases added).

---

[11] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.   While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

[12] Cox argues that the subjective recklessness standard articulated by the Eleventh Circuit in *Wade*, 106 F.4th at 1257–58, should not apply; instead, Cox believes the objective standard that the Supreme Court applies to excessive force claims asserted by pretrial detainees should apply. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015).  As Cox concedes, however, "[t]he Eleventh Circuit . . . has held *Kingsley* does not affect medical care cases." (Doc. 80 at 7) (citing *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla.,* 871 F.3d 1272, 1279 n.2 (11th Cir. 2017)).  Accordingly, the Court will apply the subjective recklessness standard articulated by the Eleventh Circuit in *Wade*.

A "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment" under the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (discussing the Eighth Amendment's deliberate indifference standard).  Conduct that amounts to mere negligence or "an inadvertent failure to provide adequate medical care" is insufficient to establish deliberate indifference. *Estelle*, 429 U.S. at 105; *Farmer*, 511 U.S. at 835. Medical treatment need not be "perfect, the best obtainable, or even very good," and "[a] prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't. of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (discussing the Eighth Amendment's deliberate indifference standard).  Notably, a "[p]laintiff's failure to diagnose theory . . . is insufficient to state a claim for deliberate indifference" under the Fourteenth Amendment. *Callahan v. Correct Health Care*, 2018 WL 4932874, at *2 (S.D. Fla. May 8, 2018) (discussing the Eighth Amendment's deliberate indifference standard) (citing *McElligott v. Folley*, 182 F.3d 1248, 1256 (11th Cir. 1999)).

Assuming without deciding that Hinson's condition constituted an objectively serious medical need, the Court begins by analyzing whether Cox has presented sufficient evidence for a reasonable jury to conclude that Burkhalter-Murry or Smoak were "subjectively aware that [their] own conduct put [Hinson] at a substantial risk of serious harm." *See Wade*, 106 F.4th at 1255.

### 1.    Subjective Recklessness

To show that the Defendants were subjectively reckless, Cox must demonstrate both that Burkhalter-Murry and Smoak (1) were "subjectively aware that [their] own

conduct put [Hinson] at a substantial risk of serious harm" and that they (2) did not "respond reasonably" to that risk. *See Wade*, 106 F.4th at 1255. The Defendants argue that the "Plaintiff's evidence does not create a material dispute of fact as to whether Defendants actually, subjectively knew their actions or inactions exposed [Hinson] to a serious risk of harm." (Doc. 81 at 5). Specifically, they assert that "there is simply no evidence that indicates Hinson exhibited or complained of symptoms that were so obvious that even a lay person would easily recognize the necessity for emergency medical care," and that "[a]ny assertion to the contrary is blatantly contradicted by the medical records Plaintiff submitted in opposition to summary judgment."[13] (*Id.* at 8). Cox argues that statements from Wife and other inmates "provide confirmation that Hinson was begging for help" and allow a reasonable jury to "conclude that both [Smoak] and Burkhalter-Murry knew that Hinson was in serious medical distress, not just uncomfortable from non-serious conditions." (Doc. 80 at 2–4). The Court will analyze

---

[13] As an initial matter, the Court rejects the Defendants' argument that Hinson's medical records can, at the summary judgment stage, "blatantly contradict" competing evidence presented by Cox. (Doc. 81 at 8). The question before the Court at summary judgment is "whether there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Sears v. Roberts,* 922 F.3d 1199, 1207 (11th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). True, the Supreme Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372 (2007). "But there's a big difference between the record evidence presented in *Scott* and the record evidence proffered here. In *Scott*, the record evidence that blatantly contradicted the plaintiff's version of events was a videotape of the car chase at issue." *Sears*, 922 F.3d at 1208. Here, the Defendants argue that Hinson's medical records have the same effect. But because medical records "involve people and all their attendant mental infirmities, biases, and limitations in their creation," they "are not the same as incontrovertible video evidence that courts must accept over contradictory" evidence, such as sworn statements from the opposing side. *Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x. 910, 916–17 (11th Cir. 2019). Here, the Court considers Cox's evidence, and all other record evidence, in the light most favorable to him.

the claims against Burkhalter-Murry and Smoak individually, beginning with Burkhalter-Murry.

### a.     Burkhalter-Murry

The Court begins by analyzing whether there is sufficient record evidence for a reasonable jury to conclude that Burkhalter-Murry was "subjectively aware that [her] own conduct put [Hinson] at a substantial risk of serious harm." *See Wade*, 106 F.4th at 1255.  In her declaration, Burkhalter-Murry asserts:

> [Hinson] did not present with any symptoms or complaints that caused [her] to believe that he was experiencing a serious medical event that required emergency medical treatment.  At no time did Hinson request emergency or additional medical treatment.  Specifically, [Burkhalter-Murry] did not take any action to restrict, block, or delay Hinson access to medical care or prescribed medical treatment and know[s] of no instance where Jail staff did.

(Doc. 74-2 at 5).

Supporting this assertion are Hinson's medical records, which contain no indication that he complained of an emergency condition or was displaying symptoms of an emergency to Burkhalter-Murry.  Cox submits Hinson's medical records, Wife's declaration, and Inmates' interviews, and argues that "Hinson communicated [his] extreme symptoms to Burkhalter-Murry." (Doc. 80 at 5).  The Court—viewing all evidence in the light most favorable to Cox—finds the record evidence insufficient for a reasonable jury to conclude that Burkhalter-Murry possessed the requisite subjective knowledge.

The record shows that Burkhalter-Murry knew Hinson was suffering from an ailment, but not that she knew he was suffering from an emergency or that her inaction "put [Hinson] at a substantial risk of serious harm." *See Wade*, 106 F.4th at 1255.  Wife claims that Hinson told her that he was "begging for help" but "could not get anyone to help him" and that he was "doubled over in pain," "throwing up," "crying," and so "weak and sick . . . that he could not even stand up to talk" on the phone. (Doc. 79-4 at 2).  But Burkhalter-Murry saw Hinson on four occasions while he was incarcerated, and there is no evidence that the severe symptoms Hinson communicated to Wife were ever communicated to Burkhalter-Murry.  The medical records, which the Defendants used to track an inmate's "medical requests, responses to those requests, screening, examination, treatment, [and] any pertinent medical information obtained during screening," show that Hinson did not complain to Burkhalter-Murry that he was suffering from an emergency or report that he was suffering from symptoms emblematic of an emergency. (Doc. 74-1 at 4).  Inmates' interviews also fail to suggest that the emergent symptoms Wife describes were communicated to Burkhalter-Murry.  If anything, the Inmate interviews show that Jail staff was attentive to Hinson's concerns and made efforts to address them, checking on him regularly.

Cox argues that even if there is no direct evidence of Burkhalter-Murry's knowledge, "a factfinder may conclude that [Burkhalter-Murry] knew of a substantial risk [to Hinson] from the very fact that the risk was obvious." *See Farmer*, 511 U.S. at 842.  But the evidence shows that Burkhalter-Murry "did not know of the underlying facts indicating a sufficiently substantial danger and that [she] was therefore unaware of a

danger" to Hinson. *See id.*  Assuming for the sake of argument that the symptoms Hinson expressed to Wife and his behavior in the Jail housing unit were obviously indicative of an emergency medical condition, Cox has presented insufficient evidence that Burkhalter-Murry personally observed or knew of these symptoms.  Without knowledge of the facts which allegedly made Hinson's emergency condition obvious, a reasonable jury could not conclude that it was obvious to Burkhalter-Murry.

Even if Burkhalter-Murry was aware of these alleged emergency symptoms, Cox has failed to demonstrate that she did not respond reasonably to the risk posed by those symptoms.  "A defendant who 'responds reasonably' to a risk, even a known risk, 'cannot be found liable'" under the Fourteenth Amendment. *Wade*, 106 F.4th at 1255. Burkhalter-Murry knew that Hinson was on a medical plan to address potential opioid withdrawals.  She also knew that his vitals had remained stable all week.  During Hinson's sick call, the record evidence shows that Burkhalter-Murry, far from knowingly letting his condition deteriorate, tried to help him.  Hinson complained that, for five days, he had a stomachache, a headache, and no bowel movements. (Doc. 74-1 at 8).  In response, Burkhalter-Murry examined Hinson's vitals and abdomen. (*Id.*).  Other than his blood pressure, which had dropped to "within the normal range," and his pulse, which had risen to 121, "all other vital signs were stable and consistent." (*Id.*).  Burkhalter-Murry found that his abdomen was tender to the touch, but that bowel sounds were present in all four quadrants. (*Id.*).  "Burkhalter-Murry provided treatment consistent with the symptoms presented and complained of[,] which included Miralax for the constipation and Tylenol for the headache." (Doc. 74-2 at 5).  Smoak said that it was his

"professional opinion that Burkhalter-Murry provided the appropriate treatment consist[ent] with the symptoms reported by Hinson." (Doc. 74-1 at 8).  Under Cox's theory, Burkhalter-Murry could have taken all of these steps and still be held liable for a *constitutional violation* because she did not identify with precision Hinson's condition. The Court rejects that theory.  It cannot be said that, based on Hinson's symptoms and history of opioid abuse, Burkhalter-Murry's response was unreasonable.  And Cox has introduced insufficient evidence to demonstrate that it was.

Ultimately, and tragically, Hinson passed away.  But that conclusion cannot drive the legal analysis here.  The standard for deliberate indifference under the Fourteenth Amendment is not akin to *res ipsa loquitur*.  Instead, the Plaintiff must show that Burkhalter-Murry had actual knowledge that her conduct put Hinson at substantial risk of serious harm.  Cox fails to do so.  The Fourteenth Amendment does not require that medical care be "perfect, the best obtainable, or even very good." *Keohane*, 952 F.3d at 1266.  Conduct that amounts to mere negligence or "an inadvertent failure to provide adequate medical care" is insufficient to establish a constitutional violation. *Estelle*, 429 U.S. at 105; *Farmer*, 511 U.S. at 835.  Because Cox cannot establish that, even if Burkhalter-Murry was aware of Hinson's emergency symptoms, she failed to respond reasonably thereto, a reasonable jury could not find that she violated Hinson's constitutional rights.

The record lacks sufficient evidence from which a reasonable jury could find that Burkhalter-Murry subjectively knew of a substantial risk of serious harm her conduct posed to Hinson.  Consequently, on this record, Cox cannot show that a genuine dispute

of material facts exists as to whether Burkhalter-Murry violated Hinson's Fourteenth Amendment rights.  Accordingly, Burkhalter-Murry is entitled to qualified immunity on Hinson's deliberate indifference claim.

### b.    Smoak

The Court moves next to analyzing whether there is sufficient evidence for a reasonable jury to conclude that Smoak was "subjectively aware that [his] own conduct put [Hinson] at a substantial risk of serious harm." *See Wade*, 106 F.4th at 1255.  Smoak saw Hinson on just one occasion:  for his intake examination on January 21.  Cox also asserts that "Smoak . . .  was contacted by Burkhalter-Murry on January 24," in connection with the sick call.[14]  Because the Court has dismissed all claims which occurred prior to January 23, Cox argues that Smoak was deliberately indifferent to Hinson's serious medical condition in connection with the sick call on January 24.  In his declaration, Smoak asserts that the "medical treatment provided was consistent with the symptoms complained of by Hinson.  At no time did Hinson report symptoms to any of the medical staff or exhibit symptoms that would have led them to believe that he was suffering a medical condition requiring urgent medical attention." (Doc. 74-1 at 8).  Cox presents Hinson's medical records, Wife's declaration, and Inmates' interviews, and argues that "Hinson communicated [his] extreme symptoms" to Smoak. (Doc. 80 at 5).  The Court must determine whether Cox has presented sufficient evidence to create a

---

[14] Cox cites to Burkhalter-Murry's declaration (doc. 74-2 at 5, para. 17) in support of this assertion.  That evidence, however, does not support this assertion, and the only connections the Court can find between Smoak and the sick call is a bullet point with Smoak's name on Hinson's medical records and Smoak's statement that it is his "professional opinion that Burkhalter-Murry provided the appropriate treatment consist[ent] with the symptoms reported by Hinson." (Doc. 74-1 at 8).

genuine dispute of material fact on this point—whether Smoak was actually aware that Hinson was suffering a medical emergency and that his action, inaction, or both put Hinson at risk for serious harm. *See Wade*, 106 F.4th at 1255.

Like with Burkhalter-Murry, the record is insufficient to show that Smoak actually knew Hinson was suffering from a medical emergency.   On January 20, Smoak conducted a full examination of Hinson upon his arrival at the Jail and noted concerns with opioid withdrawal. (Doc. 74-1 at 6).   To address those concerns, Smoak recommended a treatment plan involving medication to aid in opioid withdrawals. (*Id.*). Hinson's medical records do not indicate that he was having a medical emergency at the time, and the phone calls that Wife references did not begin until January 21, after Smoak had already seen Hinson for his intake examination.

Beyond Hinson's intake examination, the only subsequent contact Smoak allegedly had with Hinson came indirectly on January 24, 2021, in connection with Hinson's sick call.   All that links Smoak to this sick call is his declaration that, in his professional opinion, "Burkhalter-Murry provided the appropriate treatment consist[ent] with the symptoms reported by Hinson." (*Id.* at 8).   Accepting Cox's contention that Burkhalter-Murry called Smoak in connection with the sick call, Burkhalter-Murry declared that Hinson did not present to her or complain of any symptoms which would imply he was facing an emergency. (Doc. 74-2 at 5).   And even if he did, there is further insufficient evidence that Burkhalter-Murry communicated any such symptoms to Smoak.   Because Smoak had not seen Hinson since his January 20 intake examination, Hinson's emergency condition on January 24 could not have been so obvious to Smoak

21

that a reasonable jury can infer he knew thereof.  Cox has thus failed to present sufficient evidence from which a reasonable jury could conclude that Smoak was actually aware of Hinson's emergency medical condition, and that Smoak's "own conduct put [Hinson] at a substantial risk of serious harm." *See Wade*, 106 F.4th at 1255.

Finally, the parties discuss *McElligott v. Foley*, a case in which the Eleventh Circuit denied qualified immunity to jail medical staff who the plaintiff inmate had alleged were deliberately indifferent to his severe stomach pains. 182 F.3d 1248 (11th Cir. 1999).  But, as the Defendants point out, the facts of *McElligott* are distinguishable from the facts of this case.  In *McElligott*, the inmate informed jail staff upon his arrival to the facility that he had been experiencing severe abdominal pain, vomiting, and nausea for five months. *Id.* at 1251.  The jail doctor, without examining the inmate, prescribed him Pepto-Bismol and a liquid diet. *Id.* at 1252.  Approximately three weeks later, the inmate renewed his complaint of severe intestinal pain and vomiting. *Id.*  Once again, the doctor chose not to examine the inmate and instead prescribed Tylenol and Pepto-Bismol. *Id.*  Two days later, when the doctor finally did examine the inmate, he noted that the inmate was, in fact, in severe abdominal pain. *Id.*  In response, he prescribed an anti-gas medication, which soon ran out, with no option to refill. *Id.*  Two months later, the inmate again complained of his stomach pain and indicated that it was getting worse. *Id.*  The doctor refilled his anti-gas prescription. *Id.*  Thereafter, the inmate, who by this point had lost a significant amount of weight, wrote the doctor multiple letters and contacted prison nurses constantly to complain of his worsening conditions. *Id.* at 1253.  His sister called county administrators and begged them to help. *Id.*  The doctors and nurses, knowing of

22

the inmate's complaints to them directly and to county administrators, declined to alter the inmate's course of treatment until the doctor began to suspect that the inmate was suffering from an ulcer. *Id.* After prescribing Prilosec, which did not help, the doctor finally sent the inmate off for further testing. *Id.* He was diagnosed with terminal stomach cancer nearly six months after he was initially incarcerated. *Id.*

In denying qualified immunity to the medical defendants, the court observed that the inmate's "nearly constant complaints about the pain he was having, addressed to" the doctor, and the doctor's own "notes from his examinations, as well as his deposition testimony, reflect that he was aware that [the inmate] was suffering from serious abdominal pain." *Id.* at 1256. Here, in contrast, Cox fails to present sufficient evidence that Hinson's complaints were addressed to Burkhalter-Murry or Smoak. In other words, Cox fails to show that they knew of the complaints, and neither the Defendants' notes nor declarations indicate that they were aware of the severity of his condition. The *McElligott* court further highlighted that "the risk of harm to [the inmate] was obvious" "given the extent of deterioration and weight loss" that he underwent over his six months incarcerated. *Id.* While Wife claims that Hinson told her he was doubled over in pain and crying, there is insufficient evidence that either Defendant witnessed or otherwise knew about that physical manifestation of Hinson's condition. Finally, the *McElligott* court acknowledged that "County administration, after [the inmate's] sister's complaints to the County Commissioner, notified both [defendants] of the need to look into [the inmate's] case." *Id.* Here, there is no such evidence that the Defendants were warned of Hinson's condition.

With the benefit of hindsight, it is easy to argue that Burkhalter-Murry or Smoak should have known Hinson was suffering from a life-threatening condition.  It is not easy, however, for medical personnel to correctly diagnose every condition, especially when the patient complains of and exhibits symptoms that are consistent with pre-existing conditions.  The doctrine of qualified immunity acknowledges this difficulty by shielding medical personnel from constitutional liability for mistaken diagnoses.  Because the Court concludes that Burkhalter-Murry and Smoak were not "subjectively aware that [their] own conduct put [Hinson] at a substantial risk of serious harm," they did not violate the Fourteenth Amendment. *See Wade*, 106 F.4th at 1255.  Accordingly, Burkhalter-Murry and Smoak are entitled to qualified immunity on the Plaintiff's deliberate indifference claims, and the Defendants' motion for summary judgment is due to be granted.[15]

## VI.  CONCLUSION

For the reasons stated above, and for good cause, it is

ORDERED that the motion for summary judgment (doc. 73) is GRANTED on all claims against all Defendants.  It is further

ORDERED that all pending motions are DENIED as moot.

A separate Final Judgment will be entered.

---

[15] Because the Court determined that neither Burkhalter-Murry nor Smoak violated Hinson's constitutional rights, it pretermits discussion regarding whether the law was clearly established and the Defendants' argument surrounding medical expert testimony.

DONE this 22nd day of November, 2024.

                                     /s/ Emily C. Marks
                              EMILY C. MARKS
                              CHIEF UNITED STATES DISTRICT JUDGE